case. Please proceed. Please record Council. My name is Mitch Gilthoma, and I represent the appellant John Churchill in this case. There are two issues we're here for on the appeal. First, whether the circuit court erred by denying John Churchill's petition to terminate maintenance based on Amy Churchill's cohabitation with Jared Vogel. And two, whether the circuit court erred by awarding Amy Churchill permanent maintenance when the marriage lasted only 17 years. I'll briefly touch upon issue number two. Did you say only 17 years? Correct. I'll briefly touch upon issue number two. And our whole point of addressing the issue for the award of maintenance dealt solely with the fact that the trial court judge deviated from the standard. And I understand the combined gross income of the parties is over 500,000. However, we didn't feel that the order actually clarified why he went above and beyond and awarded permanent maintenance as opposed to some other number besides the 13.4, which we thought should have been allocated for. My focus here today, though, is on the first issue, because I believe that second issue will become a moot point once you hear the robust facts based on his cohabitation case. We know that Section 510C of the IMDMA states the allegation of paid maintenance is terminated if the party receiving maintenance cohabitates with another person on a resident continuing accountable basis. We, the party seeking the termination of maintenance, have the burden to prove cohabitation. We understand this court will not reverse the ruling unless that ruling is against the manifest weight of the evidence, because it was unreasonable, arbitrary, or not based on the evidence. I submit to this court that it was all three of those. Fortunately for John, this court, eight months ago, issued a ruling and an opinion in Henry Meyers of Walford that affirmed the third district's longstanding view on cohabitation. This court then followed it up with a September 13, 2018, Rule 23 order confirming the same. Namely, the court examined the totality of circumstances and points to a six-factor test to analyze a cohabitation case. Those six factors include the length of the relationship, the amount of time the couple spends together, the nature of the activities engaged in, the interrelation of personal affairs, whether they vacation together, and six, whether they have holidays together. I'm going to address those factors in line. In comment, you will see that this case was a case of cohabitation between Amy and Jared Fogle. The first factor is the length of the relationship. Counsel will get up here and he'll say the length of the relationship lasted 10 months. We say it's 14. Now, this court may look at me and say, you know what, counsel, that's not a lot of time. But I will say this. Testimony in court proved when Amy first got married to John Churchill, from the moment she met him to the time they were at the altar, it was seven months. So she's established the precedent herself of the appropriate length of the relationship should be. So in this case, in fact, she went above and beyond her initial marriage for her second go-around. Procedurally, John and Amy separated on September 27, 2006. First time was with an official marriage, right? Correct. It was a marriage license on the first go-around. Correct. John and Amy separated on September 27, 2016, and less than 30 days later, testimony was proved at court that Jared's black truck began parking at the marital residence at 100 Territory Support in Illinois. Further, Amy and Jared had New Year's Eve plans, 2016, that further established that this relationship started before this February date that this counsel will get up here and talk about. Moreover, Jared visited Amy in the hospital in January of 2016 and bought one of the children of $340 pair of shoes in January of 2017. So again, I'm bracketing this relationship. It extends past what counsel will argue here. At the very least, we submit to this court that the first factor is neutral, and if anything, weighs in John's favor because of Amy's precedent she set with her first initial marriage. The second factor, regardless of that, the first marriage is a precedent. I believe she set a precedent with how her first marriage went from the time she met John Churchill to the time that they got married was seven months. Does that have any relevance at all in this case, legally or factually? I believe it does in this case specifically with the wedding rings that they exchanged, Your Honor. And I'll get to that in a moment. Turning to the second factor, the record indicates Amy spent a substantial amount of time with Jared, but before Jared traveled for his job, they would be together all the time. Incorrectly, the trial court stated, only through Amy's testimony was it established that Jared spent approximately seven days total during the year-long investigation. That is factually inaccurate according to testimony. Counsel himself would agree. The Walter case that you're relying on, wasn't the finding there that she had moved in and had been there in that residence from May to November on a daily basis? I mean, you're not alleging that he's there on a daily basis, are you? We're alleging that he's there anywhere from three to four days per week based off of his testimony and also the testimony of Amy. I said, I thought that the private investigator testified that he couldn't say with any certainty that he had ever spent the night there. Correct. And we would submit to the court that the private investigator would see his vehicle parked there at 9 p.m. and then also see his vehicle there at 6 or 7 a.m. the next day, leaving the residence. He admitted he did not see him sleeping in the room at night. We believe there's a reasonable inference that he was obviously staying there based off of his own testimony, that he was there four nights per week. And correct, Your Honor, Justice Carvin himself did issue the dissent in that case. Turning to the third issue, this dealt with the nature of activities engaged in. And I will submit to the court that they engaged in much more activities than the couple in Walter. First and foremost, Amy and Jared testified they had a monogamous sexual relationship and shared a bedroom together. Jared mowed the lawn. He hedged the grass. He would take the garbage out. Jared and Amy would go grocery shopping together. In fact, on the record, page 53, Amy says, if I was going to cook dinner for us, I'd buy groceries and cook dinner. She says us. She'll say we. I'm going to get to the plural and possessive pronouns here shortly, just like the case of the instance in Walter. Jared would do laundry at Amy's house. They went bowling together. They went to movies together. Jared helped Amy move physical residences. She didn't reimburse him. You don't reimburse a spouse. You just expect those things to be done. Would you say the same would be true about just a boyfriend? Arguably, a boyfriend could do that. A boyfriend could go out of his way to move a U-Haul truck, help her move, help her go to a storage facility, help her do all those things. Sure. Jared also helped the children with his homework. He went to Amy's attorney's office with her together. They spent time with each other's family and friends. They drove each other's vehicles. Jared would take the kids without Amy present to social events. When he traveled for work, he would leave his vehicle at Amy's home. The problem with Jared was he was a traveling businessman. There's no dispute about that. The fact is he, even on the record, he doesn't have a permanent place to live. He does not have a permanent address. Because he was a traveling businessman, the question for this court is what do you do with a guy who doesn't have a permanent address? You rely on that person's statements and what the evidence put forward to the court. And I'm going to submit an attachment to our appendix. You'll see Jared Fogle himself on a statement of value in June of 2017, and counsel's going to get up here and say, oh, he had moved to camp by then. He's signing up for products using her address. He told these people this is where he lives, 100 Territories and Morton, Illinois. That's his testimony. Moreover, Amy created a digital scrapbook on Facebook with over 75 photographs depicting her relationship with Jared. The evidence in this case is absolutely overwhelming. Some of the phrases and captions she would use on Facebook, grilling at home in the snow, welcome to Illinois, with a picture of Jared. Thinking about our party back home in Texas with family and friends, grandparents are the best. We love you, grandpa. She's saying we about Jared's grandpa. Moreover, she says in a post right here, we love these kids. It's homecoming week. We. It's Jared and Amy and then a picture of two kids. She's obviously referring to themselves. People post some of these comments. They say this is my true happiness. Amy posted a selfie with Jared and the kids from Hoover Dam when they went to Arizona and Las Vegas together. She says, true happiness. I can't stop smiling. Somebody replies, I'm very happy for you. She says, it's been too long. I finally found happiness. We are finally happy. We. It's a family atmosphere. Fourth, I want to discuss the interrelation of personal affairs, which we know Amy intermingled most aspects of her life with Jared, including sharing a bedroom both at home and when they travel on the road together. Other examples of the interrelation of personal affairs, Jared put up his Netflix account on her home television. Moreover, he put his Netflix account on the children's iPads. Think about when the children log into their iPads, they log into Jared Vogel's account, no Churchill account, Jared Vogel. Moreover, Amy would give Jared money at the casino when his luck ran out. Think about that. Is that something boyfriend and girlfriend do with each other? Is it give money? That's what spouses do to each other. Here, here's supplemental income. Take this and keep playing. Moreover, they'd watch TV in bed together. They would give each other gifts, including rings, including necklaces. Even more compelling about the personal affairs, Jared would use Amy's home address for both personal and business mailings. Jared sent protein powder to Amy's house. Think about that. Would you send personal stuff or personal items or medicine, anything, to your business? No, you send it home. You send it to where you live, and that's exactly what he did. He sent it to Amy's address. Perhaps most compelling, Amy was using Jared's last name to make public representations. Her name is Amy Churchill. This all happened pre-judgment. We found her receipt when we were doing a lawful search of the house for property items, and the receipt says Amy Fogle. It doesn't say Amy Churchill. Can you imagine if a neighbor, if a mail carrier, if one of the children saw Amy Fogle? They could reasonably say, congratulations on your wedding. She's changing her last name. That fact has been unprecedented, never before been seen in a reporting decision in Illinois State history. This goes directly to the permanent intent behind the relationship between these two. The fifth and sixth factors deal with vacations, and they deal with holidays. I will say this and submit to this court, Amy and Jared took more vacations than the couple in Walther and spent more holidays than the couple in Walther did together, and this court still terminated maintenance. Specifically regarding the vacations, in Walther, the party simply went to Biloxi, Mississippi to do a few concerts together overnight. This case, much different. They had weekend getaways in Chicago. They went to Iowa to escape groups. They would take day trips to Macomb for events and for holidays, for family get-togethers. They'd go to Las Vegas for four days, stay in the same motel, sleep in the same room. They went to Texas, not once, but twice to Texas. Jared paid rent for them to go direct flight to Texas, and then he drove them back in his new car. These are things that spouses do together, drive across the country together. The evidence of vacations is overwhelming. The fifth factor clearly weighs in favor of termination. Sixth factor regarding the holidays. The better question for this point, what holidays did they not spend together? They had plenty to spend New Year's Eve in 2016 together, but Amy got sick. They had Valentine's Day together. Mother's Day, where they all traveled home to Amy's mom's house. They had Father's Day, where the children, and I repeat, the children got Jared Fogle a Father's Day card. They didn't give their own dad a Father's Day card. They got the new de facto husband a Father's Day card. They had Fourth of July together in Muscatine Island. They watched fireworks. They had a Labor Day picnic together. They were together for each other's birthdays. They were together for the children's birthdays. They spent Halloween together in downtown Chicago. On Thanksgiving, Amy brought her parents over to Jared's relative's house in Oconee, so all could be together as one big happy family. Looking at all six factors alone, five of the six factors without question are a slam dunk in favor of termination. The only factor that is neutral or may just lead a little bit in John's direction is the length of the relationship. Now, counsel will get up here and tell you that this relationship was not a forever thing. It was not permanent, and Amy never wanted to get married again. But I ask this question. Besides a marriage certificate, what is the greatest physical sign of marriage? I submit to that court the answer is obvious. It's rings on a ring finger. Well, shocking as it may be, we had rings on a ring finger in this case, too, by both Amy and Jared. In fact, I asked Amy at trial, for a man in his early 30s to wear a ring on his ring finger. Would that lead you to believe he was married? Answer, sure. Even more importantly, listen to what Amy said next on the record, page 56. Quote, and he doesn't even feel comfortable wearing it because of what people would think it means. And we're not even there yet. Yet. Fortunately for us, the law doesn't require us to be there yet. It says if you're cohabitating on a resident, continuing, and conjugal basis. Isn't there a financial component to this? Absolutely, and I'm glad you brought that up. In the interrelation of personal affairs, and I made this point to the trial court, and the trial court, in my opinion, completely missed this. Jared was staying at the marital home of Tara Trace, which was a million-dollar home. The cost of running that home per month was about $7,000 to $8,000. I submitted to the court in closing arguments, Jared did not contribute one penny to the marital home. That was a fact. Answer me, two minutes. Thank you. Amy didn't contribute, Amy wasn't paying for that home either. John was paying all the expenses once he moved out. So think about this. Amy, via John, was supporting Jared living at the marital home. Jared signed up using their address. He sent an email there. Jared was the one that did all this. Moreover, she's winning him money at a casino. Also, facts prove that Jared would drive up to an ATM, use Amy's card at the ATM to withdraw money, and then hand it over to Amy. Interrelation of personal affairs to me could be nothing greater than using Jared's last name. That's personal affairs. And Jared at trial testified, he said this. He said, well, I ordered a project, a gift for Amy. I wanted it sent to the marital home. I wanted to use my last name, but I wanted to wait until she got home to open it. If that's not interrelation of personal affairs, I don't know what is, Your Honor, because I would submit that. There's no greater representation when you see your last name changed on what you personally mean, your interrelation of personal affairs to me. Turning to the credibility briefly in this case before I turn it over to counsel, the trial court made no credibility determinations in this case. Amy was impeached four different times. Jared was impeached five times. In Amy's deposition, she was asked if Jared ever had a garage door opener in the home. She replied, never. At trial, she was impeached, and then she said to me, oh, thank you for bringing that up. I forgot. He did actually have a garage door opener. Due to the excessive eye contact between Jared and Amy on the stand at counsel table, the court suggested I stand in between the two to thwart any collusion attempts. Never mentioned it in the trial court order. Even more compelling, the court ordered a five-minute recess to avoid any shenanigans, and the court used the word shenanigans, in the courtroom, and instructed Amy that if it continues, she would be removed from the courtroom. Never mentioned. What was she doing? Jared had given an answer about something that he got from the boys for a gift on their birthday, and she disagreed with it because she said something different that morning. So she wanted to basically thwart the idea to the court that he was lying or she was lying. It was clearly obvious from the record. With that, I'd like to reserve the time for rebuttal. Thank you. Counsel. Good afternoon, Your Honors. Counsel, may I please the court. This case began concurrently when Amy Churchno was filed for dissolution of marriage as well as an order of protection after suffering years of abuse by her husband. Jared repeatedly threatened Amy with financial ruin if she ever left him, and he's attempting to make good on that throughout the trial court proceedings and throughout this appeal. Counsel has mentioned a number of factors that are well established, be it snow and, most recently, be it water. And I'd like to address each of those factors as it relates to the facts of this case. The length of the relationship. Amy first met Jared in November of 2016, as established in the record, and they began dating on Valentine's Day of 2017. Jared's work and living situation was quite temporary. When he met Amy, he informed her that he owned a traveling metal magic business that goes to areas where hail damage has occurred. And so, as soon as the hail damage has been repaired, he's moving on to the next city. In fact, as of June of 2017, well, as of April of 2017, he had left Norman. They met in February. In April, he had moved on to Canton. And he was in Canton until June of 2017 when he moved to Muscatine, Iowa. And from there, it was on to Missouri, and I believe he's in Colorado now or somewhere out of state. Is the relationship still intact? It is. It is. However, they don't see each other very often. And the relationship did begin to happen. And Amy and Jared both testified at the trial level that they did spend as much time together as possible in those early months. As people who are in a newly dating relationship are often apt to do, they were together. But the private investigator was never able to establish definitively whether or not Jared spent the night there. And it wasn't a matter of his vehicle was seen at the house at 9 o'clock at night and then at 6 or 7 the next morning. Oftentimes, the next morning when the private investigator did see Jared's vehicle, was traveling on a road to Amy's house. The same road that Amy's house lies on, which happens to be off of Main Street. Literally, the main street in the town. So he would see his car on Main Street, and the private investigator assumed that Jared had spent the night there. There were absolutely no definitive facts of that. Interestingly, the guardian of item was reappointed in the case to investigate the allegations of cohabitation. After meeting with the children five or seven times throughout the life of the entire case, the GAO felt confident that the children were being honest with her when they said, Jared doesn't live here. He's treated as a guest in our home. He's here for two to three to four nights every so often. And that was from June when he moved to Iowa on through to, I would assume, the present. The amount of time I've briefly addressed before that the couple spent together, the activities that they engaged in, they went to movies together, as most dating couples do. They went bowling and took Amy's children with them. When they went bowling, two times. They went to dinner on their own and actually took Amy's children to dinner. Amy established in her testimony at the trial level that it was extremely important to her that her children liked whoever it was that she was going to be dating. And if they didn't, she wasn't going to continue. And that was also in depositions. She repeatedly said, I want my children to be a part of this. And I want them to either like this person, and if they don't, then I'm not pursuing it any further. Also, with the activities engaged in and the amount of time spent together, Jared testified at the trial level that he didn't even keep a toothbrush in Amy's home. Occasionally, he had left a sweatshirt or a pair of slides after spending the weekend. When we look at the interrelationship of affairs, there's absolutely no financial commingling. Amy's bank accounts were turned over as part of the discovery process, and Jared's bank accounts were turned over in response to a request to produce. Jared's accounts do list a permanent address. His permanent address is in Gold Lake, Texas. Jared testified to the fact that his address, his permanent address, is in Texas on his parents' ranch. In Jared's accounts, which show not only that Amy was not on those financial accounts, they also prove that Jared was not living in Morton, Illinois, at either of Jared's rates, or Amy's home on North Morton Avenue. Tons of different charges in Iowa, when he was living in Iowa. Tons of different charges in Missouri, when he was living in Missouri. Amy and Jared notably talked about marriage. Amy admitted on the stand that she was not there yet. She wasn't ready for it, and she shared that with him. They had no shared residence, no shared house, no joint assets whatsoever. Hadn't purchased property together. These things were all cut heavily against an interrelationship of personal affairs. Amy and Jared admitted throughout trial testimony and in depositions, had very difficult times with dates. And counsel brought up a couple of issues where Amy was supposedly impeached based off of her testimony. But in fact, in her deposition, she did answer. She said, oh no, we didn't spend Halloween together. And when she was asked about it again, she said, well, we didn't spend the night of Halloween together. Yes, we went to a Halloween party together. They did spend most holidays together. We'll admit that. As often dating couples do. As to the trips that they took together. Well, counsel's including Iowa in there. That wasn't a trip together. That was Amy going to visit her boyfriend at his house. He lived in Iowa. As to Texas, yes, Jared did take Amy to Texas to meet his ailing grandfather. And then she went back one other time. They went to Las Vegas together. Notably about the Vegas trip, they both paid for half of it. Amy has a different manner of speech. And so she'll say we, if there are two people in the room. She'll say, we are so happy. In part, when she talks about her children and she's saying we, we are so happy. Well, the evidence that was produced at trial would lead to the conclusion that that's absolutely true. That she and her children are very happy. In comparison to how they were before. The fact that this case began with an order of protection is important. Because both Amy and the children experienced years of unhappiness. The Gardner and Heidemer courts reflect that. And the trial court, in its order, even noted the fact that these things do have a place here. I would like to address the personal items that were sent to Amy's address. Now, counsels argued that Amy had things sent to her as Amy Fogle. There's absolutely no evidence throughout the record that that happened. The evidence in the record says that Jerry, shows that Jerry sent things to Amy Fogle on two separate occasions. And Amy even testified to the fact that she was uncomfortable with it. Amy has never referred to herself in public as Amy Fogle. One of the party's children took a Snapchat and apparently sent it out and it said, You can call me Mrs. Fogle. And Amy was asked about that and she absolutely denied it. She said, I've never said that and I never would say that. The Gardner and Heidemer didn't think that it was at all. The Gardner and Heidemer believed that it was part of a joke after talking to the children. Jerry had some personal items sent to Amy's home. He was traveling and he asked her, would it be okay if I have two pieces of equipment sent to you? And then he also had, again, while traveling, and I believe he was in between job sites and he said, is it okay with you if I have some protein powder sent to your house? And she said, sure, I have no problem with that. Amy testified that she does that routinely for her neighbors. Hey, if you need to have something dropped off, by all means, use my address. I'm usually here. I'll sign for it. At the time, Amy was also a stay-at-home parent. So she was available to collect the mail, to do those kind of things. She subsequently obtained a complaint. Counsel made note of the fact that Jerry had signed an invoice for territories. That invoice is worth looking at because he misspells the name Tara. He spells it T-E-R-A, and that's in G. If he were living at the address, don't you think he'd know how to spell it? Amy and Jerry are in a committed and dignity relationship. There's no doubt about that. But they're not in a de facto husband-wife relationship. Amy testified, I don't ever want to get married again. And Jerry, while not having specifically testified to it, a review of the transfers would support the fact that neither of them were there then in the relationship. Can I ask you a question? Sure. It's been a while since I've done one of these cases. And I don't know whether the statute has changed. I'm sorry. But my understanding of the significance of a cohabitation claim in conjunction with maintenance or termination of maintenance, the major factor is combination of money. Correct. That there's some evidence that they're maintaining a household and that that is demonstrated by the sharing of expenses. There's absolutely no sharing of expenses. There was one time when Jerry testified that he was at a casino and he ran out of cash over the day. And he said, hey, can I borrow? I don't recall the exact amount. I want to say it was $300, but I don't recall the exact amount. Can I borrow $300 and I'll pay you back? And he literally paid her back when he got to the top. So there was absolutely zero interrelationship of financial affairs between these two. Okay. It seems to me that dating relationships are very odd these days. I'm fairly old and so I'm used to a different kind of dating relationship. But it seems like things are very fluid. And the fact that somebody's dating or even in a committed dating relationship, does that have significance if there's not commingling of expenses under the statute? I don't believe it does at all. The statute says that we're for resident continuing cohabitation on a conjugal basis. And it's case law that actually says the financial affairs. I believe Miller, the second district's opinion in Miller, hit this very hard that there needs to be something more. There needs to be intended permanence. And signs of a mutual commitment. And it highlighted that interrelation of financial affairs is the biggest way that you show that there is that intended permanence and there is that mutual commitment that's there. And it's just completely lacking in this case. In the Walther case, the majority opinion, not the dissent, had a case where there was barely any commingling of funds. Correct. And so there were a lot of things, licenses and registration, that had nothing to do with the other person that was being dated. Correct. And Walther is a little bit different. Walther is a little bit different. And one of the key facts of Walther that would support the court's determination is that in that case, Liani, I'm going to butcher her name, but Liani moved her child in to this residence. I mean, they were clearly living together. There's no evidence that Amy Churchill and Jared Grobel have ever lived together. It was never established at the trial. I'll take two minutes. The trial court listed, went through, and carefully in its order, talked about each of the issues, each of the different factors under Snow, the facts of the case and applied them to them, and then when it came to the permanent maintenance award and deviating downward from the statute. And this is clearly a case where the statute does not apply for guidelines in terms of setting the amount or the duration of maintenance. Mr. Churchill's income has, it averages between $532,000 and $568,000 per year. So he's well over the $500,000 threshold. The court went through each of those 14 factors, and Mr. Churchill would argue that the fact that the court has made this a permanent maintenance award is somehow fair, while completely neglecting the fact that the court also did a downward deviation as to the amount of maintenance. Had the court applied the statute instead of getting $10,000 loan based off of 2016's income, Amy would have been entitled to $13,650 per month. And if it had gone off the year prior, she would have been entitled to $14,588 per month in statutory maintenance. So the trial court balanced the evidence when it came to this, looked at the totality of the circumstances. It did everything that the case law says it's supposed to do, and accordingly, this court, hopefully that this court would affirm the trial court's decision. Thank you. Counsel, you may close the floor. Mr. Gilfillan, I'd like to ask you the same question. Sure. About the importance, the significance of financial commingling when we're looking at this as a justification for terminating maintenance? Sure. Fortunately for us, the third district's already issued an opinion on how it views commingling of financial assets. And that came eight months ago in the intermarriage of Wofford. And Judge Carter just read about that, and he said there was no commingling of financial assets. She had a separate residence, had a separate address, had a separate driver's license. All of their assets were essentially split. There was no commingling. And the court still terminated maintenance in that case. That being said, in this case here, there's no question that there was some reliance on one another to each other. They would go out to dinner. Jared would buy for everyone. They'd buy groceries together. Amy would buy groceries. The financial records speak for themselves. No matter where Jared was at, these temporary locations, Amy was there spending an exorbitant amount of money. She'd buy groceries and bring them back to Jared's temporary establishment where he was at. And so… Now, Wofford, there was a short relationship compared to other cases, and that was a reversal of the trial judge in Wofford. Sure, exactly. And the majority didn't pay much attention about the fact that there was an absence of commingling of funds, which was your point. Correct. And it's our opinion that Amy's make was transparent attempt to insert emotion and sympathy in this case regarding money when it all comes down to cohabitation, whether she was cohabitating or not. I will say this. More compelling than Wofford, Gavin showed in that case the couple there appeared to have ended their relationship at the time of the trial. Here, it hasn't stopped. According to counsel, still going. And so to continue to receive maintenance and live like this, I think she's getting the best of both worlds. Not only is this new de facto husband providing her income, she's also getting it from her past relationship. Is he providing her with income or is he buying her gifts? I would say it's a combination of both, because if she's getting to stay at these temporary locations with him, if she's getting to use his vehicle, if she's getting to reap the benefits of him buying groceries when she's in town, she gets all of it. So she gets the benefit of him and her ex-husband, which I believe that's what the statute is intended to do. At trial, Amy could have provided a lease. She could have provided mortgage payment. She could have provided anything that showed Jared lives somewhere else and produced nothing. Moreover, there was a concealment issue in this case. Did you find anything? I mean, who has the burden of proof there? We have the burden of making substantial showing that she's in a cohabitating relationship. Once we make that substantial showing, which we believe we did, then it's up to them to come forward with some sort of evidence that no, she's not engaged in a de facto relationship, and they brought forward nothing. I want to touch upon the concealment issue in this case, because this, in my mind, creates a dangerous precedent moving forward. In this case, once Amy found out about the cohabitation law, right after the petition was filed, she went to her attorney's office with her husband. Five or six days later, with her de facto husband, I'm sorry, Jared. Five or six days later, Jared's vehicle is being parked in Amy's backyard. The tattoo or appendix, they photographed his vehicle in Amy's backyard. That set the dangerous precedent in my mind in cases going forward, saying do what they did in the Churchill case. Just hide your vehicle so you don't get caught. That is absolutely why she parked it. That vehicle was parked in the backyard so the private investigator wouldn't see it. I guess it wasn't hidden very well, was it? Based on her Facebook post, I don't think she hides much of anything. Isn't that the problem, that everything looks larger, bigger, happier, better on Facebook? I mean, that's sort of the crisis of the modern age, is that everything that's presented here, are we to take everything as the truth? Well, imagine if they did this much publicly, what were they doing privately? And I think that speaks everything about this case, that she was proclaiming to the world how happy she was, and she was finally found happiness and was in love. Just imagine with the rings and everything that, unfortunately, we found what they could have been continuing doing for the rest of the time. Briefly, I want to touch upon the other things Jared did. He wore the wedding ring for four consecutive months leading up to trial, or leading up to the petition the attorney had made that's being filed. Forty-eight hours after the petition was filed, he was taken back to the jewelry store to get resized. The ring was called a wedding carbide band. Not only that, I represent to this court, there's three ways to profess love and to prove it a fact of marriage. Three ways. Physical signs. A marriage certificate or rings. We have wedding rings in this case. Verbal signs. They said they love each other on the record. New author, they said they didn't love each other. In fact, they broke up. In this case, they love each other, and Jared even said he loves the children, and the children love him back. Amy's parents love Jared. Verbally. Thank you. Verbally, that is checked off. And the last one is nonverbal. She changed her last name. As I said earlier, I can represent to this court, no case or published opinion in appellate or Supreme Court history has ever had all three of those in one case before. She changed her name, or she just used a different name on occasion? More than once, according to Jared's testimony, she used his last name. And that, to me, is a public representation. She was just waiting to get the divorce to be finalized. But unfortunately for us, we don't have to wait until they're at the altar saying, I do. That is not what the statute requires. It just has to show a resident continuing consular basis. Because of that, we are asking that you reverse the trial court's ruling and remand the case to determine the date of cohabitation and remand for further proceedings. Thank you very much, and we patiently await your decision. Thank you, counsel. The court will take this matter under advice and render a decision in the future. And at this moment, we'll take a recess until tomorrow when we start again.